UNITED STATES of America

v.

Bernard E. MEYER et al., and Philip J. Hirschkop, Appellants.

No. 24058.

United States Court of Appeals, District of Columbia Circuit.

Argued June 10, 1971.

Decided Jan. 20, 1972.

Mr. David Rein, Washington, D. C., for appellants.

Messrs. Roger M. Adelman and Gregory C. Brady, Asst. U. S. Attys., with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, John A. Terry and Thomas C. Green, Asst. U. S. Attys., were on the brief, for appellee. Messrs. John F. Evans and Stephen M. Schuster, Jr., Asst. U. S. Attys., also entered appearances for appellee.

Messrs. Addison M. Bowman and Alan W. Scheflin, Washington, D. C., filed a brief on behalf of Georgetown University Law Center Faculty, et al., as amici curiae.

Messrs. Robert H. Turtle, Ralph J. Temple, Washington, D. C., and Melvin L. Wulf, New York City, filed a brief on behalf of American Civil Liberties Union and American Civil Liberties Union Fund of the National Capital Area, as amici curiae.

Messrs. Albert E. Arent, John Bodner, Jr., Ramsey Clark, John W. Douglas, John H. Pickering, Harry M. Plotkin, Paul A. Porter, Daniel A. Rezneck, Sidney S. Sachs and Robert L. Wald, Washington, D. C., filed a brief as amici curiae.

Before WILBUR K. MILLER, Senior Circuit Judge, and McGOWAN and TAMM, Circuit Judges.

McGOWAN, Circuit Judge:

Appellant, a member of the District of Columbia bar, was summarily convicted of criminal contempt[1] by a District Court judge acting under Rule 42(a),

---

1. 18 U.S.C. § 401 (1970) provides:

A court of the United States shall have the power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

Fed.R.Crim.P.[2] The contempt conviction resulted from a criminal trial in which appellant, as one of a number of counsel appointed by the court, represented defendants charged with burglary in the second degree and destruction of property. On this appeal, he asserts error in a number of respects, only one of which we find it necessary to resolve, namely, that he was entitled to have the contempt charge adjudicated at a full hearing before a judge other than the one who cited him. We hold that, in the circumstances revealed by this record, due process of law requires such a mode of proceeding.

I

### 1. The Trial Proceedings

Because of the disposition we make of this case, we need not recount in detail the events which took place during the criminal trial. The defendants were active in the peace movement; and the charges against them concerned a ransacking of the Washington offices of the Dow Chemical Company. Against the advice of their counsel, the defendants attempted to dismiss their appointed lawyers and to proceed *pro se*, intending to admit the acts charged and to appeal to the conscience of the jury by asserting what they considered to be the morality, as distinct from the legality, of their deeds. The chief impediment to this strategy—and the eventual source of friction between the defendants and

appellant, on the one hand, and the trial judge, on the other—was the trial judge's denial of the motion to proceed *pro se*, and his insistence that counsel be responsible for the conduct of the trial.[3]

The trial was marked by angry interruptions by the defendants, heated arguments by counsel, an apparent lack of cooperation between the defendants and their counsel, a melee in the courtroom on the fifth day of the trial, the ejection of several spectators, and the removal of the jury from the courtroom on several occasions. By the trial's close, two of the defendants had pleaded *nolo contendere* to the destruction of property charge, and two others had been cited for contempt for their involvement in the melee.

After the jury found the seven defendants who had not pled *nolo contendere* guilty of destruction of property, as well as of the lesser included offense of unlawful entry, the trial judge called appellant to the bench, cited him for contempt, and asked him to appear the following afternoon so that a contempt certificate could be read in his presence. On the following day, appellant appeared before the trial judge with counsel, who stated that he had not been able to examine the trial transcript and requested that (1) the matter be referred to another judge for adjudication, and (2) appellant be given the benefit of the procedural guarantees contained in Rule 42(b).[4] Both requests were denied, and

2. (a) *Summary Disposition.* A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.

3. While the trial judge allowed each of the defendants to make five-minute opening arguments to the jury, he looked to defense counsel to raise objections, examine and cross examine witnesses, and make closing arguments to the jury.

4. Rule 42(b) reads as follows:
   (b) *Disposition Upon Notice and Hearing.* A criminal contempt except

as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in which an act of Congress so provides. He is entitled to admission to bail as provided in these rules.

the trial judge read the following certificate:

. . . pursuant to Rule 42(a) of the Federal Rules of Criminal Procedure, 18 U.S.C., I hereby certify that I saw and heard the contempts of court hereinafter described and that they were committed by Philip J. Hirschkop in the actual presence of the court during the trial of a criminal proceeding before me entitled United States v. Meyer et al., Criminal No. 872–69.

I find that the said Philip J. Hirschkop was guilty of the following offensive, contumacious and unethical . . . contempt of court:

1. In addressing the court concerning motions of defendants to represent themselves and for the court to recuse itself, he used insulting, derogatory and disrespectful language. Tr. at 26, 28, 83–87.

2. On numerous occasions he conducted himself in a disrespectful manner and, on some of these occasions, refused to obey the court's directions to resume his seat after the court had ruled. Tr. at 5, 8–9, 224, 397, 398, 416, 443, 456–457.

3. He addressed the court at the bench in a derogatory and disrespectful manner concerning the seating in the court room and concerning his participation at bench conferences. Tr. at 95–97, 283–285.

4. He engaged in disrespectful and discourteous conduct which offended the dignity and decorum of this proceeding and which was degrading to this tribunal, in violation of the standards imposed by the American Bar Association Code of Professional Responsibility and the Canons of Professional Ethics. ABA Code of Professional Responsibility, Canon 7, EC–7–36, DR 7–106(C) (6) (1969); ABA Canons of Professional Ethics, Canon 1 (1967). Further, in the context of a difficult trial of nine defendants he failed to fulfill his obligation as an officer of this court. See appropriate portions of the trial transcript.

Wherefore, it is this 11th day of February, 1970, ordered pursuant to 18 U.S.C. § 401, that Philip J. Hirschkop be and he hereby is sentenced to serve a term of 30 days.

▮ On the next day, the trial judge filed a complaint against appellant with the Committee on Admissions and Grievances of the District Court, and subsequently appeared as the sole complaining witness in hearings before that body.[5]

### 2. *The Issue on Appeal*

In addition to the procedural issue of whether appellant is entitled to an adjudication of the contempt charges by a different judge, numerous claims have been raised on this appeal. These include an attack on the constitutionality of the federal contempt statute; a contention that that statute, properly construed, is not applicable to appellant's conduct at trial; and an assertion that the sentence imposed on appellant is disproportionate to the offense. We have examined the procedural issue first, since, if appellant is to prevail on it, he will receive a hearing at which his substantive claims can be explored.

Appellant concedes that the conduct alleged to be contemptuous occurred in the presence of the trial judge. There is no question, therefore, as to the apparent applicability of Rule 42(a). The issue presented, rather, is whether the

---

If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt the court shall enter an order fixing the punishment.

5. This court can take judicial notice of the proceedings of the Committee on Admissions and Grievances, especially where those proceedings are related to an appeal. *See* Beard v. Bennett, 72 U.S.App.D.C. 269, 114 F.2d 578 (1940) ; *cf.* Butler v. Eaton, 141 U.S. 240, 11 S.Ct. 985, 35 L.Ed. 713 (1891) ; Fletcher v. Bryan, 175 F.2d 716 (4th Cir. 1949) ; Kithcart v. Metropolitan Life Ins. Co., 88 F.2d 407 (8th Cir. 1937).

summary procedures authorized by Rule 42(a) are, despite the literal terms of the rule, to be deemed unavailable in the circumstances of this case by reason of overriding constitutional considerations. To resolve that issue, it is necessary to survey Supreme Court decisions variously approving and disapproving summary disposition, with a view to the extraction of reconciling principles.

## II

1. *Effectuating the Policies Behind Rule 42(a): From Cooke to Sacher*

Two decades prior to the adoption of the Federal Rules of Criminal Procedure, the Supreme Court in Cooke v. United States, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767 (1925), indicated that in some circumstances summary contempt proceedings before the trial judge are inappropriate, and that a hearing before a different judge is required. Cooke, an attorney representing a defendant in a series of bankruptcy suits in a federal court, wrote a letter to the trial judge following a verdict against his client in the initial suit. He requested that the judge recuse himself in the cases to follow on the grounds that his client had been slandered by his enemies before the judge, thereby making it impossible for the judge to approach the impending suits in an objective manner. Cooke further wrote that he was aware of this problem prior to the initial trial, but had not mentioned it because he had thought that the judge would be "big enough and broad enough" to withdraw from the cases of his own accord. The judge cited Cooke for contempt, and, after a heated exchange, summarily convicted and sentenced him.

Chief Justice Taft, writing for a unanimous court, found that the letter was indeed contemptuous on its face. He held, however, that summary disposition by the trial judge had been inappropriate, since the policies favoring summary proceedings were inapplicable. He articulated those policies as follows:

To preserve order in the courtroom for the proper conduct of business, the court must act instantly to suppress disturbance or violence or physical obstruction or disrespect to the court, when occurring in open court. There is no need of evidence or assistance of counsel before punishment, because the court has seen the offense. Such summary vindication of the court's dignity and authority is necessary. It has always been so in the courts of the common law, and the punishment imposed is due process of law. Such a case had great consideration in the decision of this court in Ex parte Terry, 128 U.S. 289 [, 9 S.Ct. 77, 32 L.Ed. 405.] It was there held that a court of the United States, upon the commission of a contempt in open court, might upon its own knowledge of the facts, without further proof, without issue or trial, and without hearing an explanation of the motives of the offender, immediately proceed to determine whether the facts justified punishment and to inflict such punishment as was fitting under the law.

267 U.S. at 534–535, 45 S.Ct. at 394.

Thus, there are two policies which may justify summary contempt proceedings before the trial judge. First, it may be necessary to preserve order in the courtroom in order to protect the authority of the court and the integrity of the trial process—the policy of preserving order. And, second, there is a notion that when contemptuous conduct has occurred before the judge in open court, it would be a useless formality and a waste of resources to indulge in a full hearing, because the judge, having witnessed the conduct, is competent to interpret the facts and apply the law—the waste of resources justification.

After articulating these policies, Chief Justice Taft noted that they were inapplicable to Cooke's alleged contempt, because it had not occurred in open court before the trial judge. Thus, there was no threat to the preservation of order in

the courtroom; and there were relevant facts which were not within the knowledge of the trial judge, such as the circumstances in which the letter was written, which had a bearing on the issue of intent. In the absence of these policies, the normal constitutional presumption in favor of a due process hearing was controlling. Cooke, therefore, was entitled to the following procedural safeguards as a matter of due process:

> . . . the accused should be advised of the charges and have a reasonable opportunity to meet them by way of defense or explanation. We think this includes the assistance of counsel, if requested, and the right to call witnesses to give testimony, relevant either to the issue of complete exculpation or in extenuation of the offense and in mitigation of the penalty to be imposed. 267 U.S. at 537, 45 S.Ct. at 395.

It was entirely possible, of course, for a hearing embodying those procedures to be conducted by the trial judge. Chief Justice Taft, however, noted an additional feature of the case which made it appropriate for a different judge to preside. The alleged contemptuous conduct entailed "personal criticism or attack upon" the trial judge:

> The power of contempt which a judge must have and exercise in protecting the due and orderly administration of justice, and in maintaining the authority and dignity of the court, is most important and indispensable. But its exercise is a delicate one, and care is needed to avoid arbitrary or oppressive conclusions. This rule of caution is more mandatory where the contempt charged has in it the element of personal criticism or attack upon the judge. The judge must banish the slightest personal impulse to reprisal, but he should not bend backward and injure the authority of the

court by too great leniency. The substitution of another judge would avoid either tendency, but it is not always possible. Of course, where acts of contempt are palpably aggravated by a personal attack upon the judge, in order to drive the judge out of the case for ulterior reasons, the scheme should not be permitted to succeed. But attempts of this kind are rare. All of such cases, however, present difficult questions for the judge. All we can say upon the whole matter is that, where conditions do not make it impracticable, or where the delay may not injure public or private right, a judge, called upon to act in a case of contempt by personal attack upon him, may, without flinching from his duty, properly ask that one of his fellow judges take his place. (citations omitted.)

> The case before us is one in which the issue between the judge and the parties had come to involve marked personal feeling that did not make for an impartial and calm judicial consideration and conclusion, as the statement of the proceedings abundantly shows. We think, therefore, that when this case again reaches the District Court, to which it must be remanded, the judge who imposed the sentence herein should invite the senior Circuit Judge of the circuit to assign another judge to sit in the second hearing of the charge against the petitioner.

*Id.* at 539, 45 S.Ct. at 395–396.

Several aspects of the *Cooke* decision should be noted. Chief Justice Taft believed that *both* of the policies which he articulated must be applicable in order to justify summary disposition by the trial judge.[6] He was confronted with a situation, however, in which *neither* policy was applicable, and in which there was a countervailing factor (the fact

---

6. "Punishment without issue or trial was so contrary to the usual and ordinarily indispensable hearing before judgment constituting due process that the assumption that the court saw everything that

went on in open court was required to justify the exception; but the need for immediate penal vindication of the dignity of the court created it." 267 U.S. at 536, 45 S.Ct. at 395.

that the alleged contempt was a personal attack on the trial judge) militating in favor of disposition before another judge. Nonsummary disposition before a different judge was, in other words, clearly appropriate, since the only applicable policy factor favored that result. There is no holding, therefore, as to the proper result in a situation in which the policies favoring summary disposition by the trial judge *are* applicable, *and* in which the countervailing factor of personal attack is also present. Chief Justice Taft clearly implied, however, that there were situations in which the policies favoring summary disposition by the trial judge would predominate, despite the factor of personal attack.[7]

Finally, the scope of the relief granted in *Cooke* should be noted. Chief Justice Taft found that the letter itself constituted *prima facie* evidence of contempt, which suggests that the burden of going forward on remand rested on Cooke. Of the hearing itself before another judge, he said only that due process of law "includes the assistance of counsel, if requested, and the right to call witnesses to give testimony, relevant either to the issue of complete exculpation or in extenuation of the offense or in mitigation of the penalty to be imposed . . . ."

The *Cooke* holding, in short, was of limited reach. But the opinion does contain an explication of a policy factor which militates against disposition of contempt charges by the trial judge in certain circumstances, and which is in potential conflict with the policies favoring summary disposition by the trial judge, although there was no actual conflict in the *Cooke* case.

*Cooke*, as noted, preceded the adoption of Rule 42 by two decades. After the adoption of Rule 42, it might reasonably have been expected that the Supreme Court was unprepared to consider the factor of personal attack on the trial judge as a compelling reason for his disqualification, since part (a) of that rule makes no provision for the disqualification of judges, and the inclusion of such a provision in part (b) seems to indicate that the omission in part (a) was not inadvertent. In Sacher v. United States, 343 U.S. 1, 72 S.Ct. 451, 96 L.Ed. 717 (1952), the first case to confront the issue after the adoption of Rule 42, the Court made it clear that such an expectation would have been well-founded.

*Sacher* involved the summary conviction by the trial judge of several attorneys *after* the completion of a prolonged trial in a federal court, in which they had represented the eleven Communist Party leaders convicted of Smith Act violations in Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). Although the events leading to the contempt citation were not fully explicated in the *Sacher* opinion, it is clear that the contemptuous conduct occurred *in the presence* of the trial judge, and that it included *personal attacks* against him.[8]

---

7. Thus, he wrote that the "substitution of another judge . . . is not always possible," and that substitution was appropriate only "where conditions do not make it impracticable, or where the delay may not injure public or private right."

8. The majority opinion states that the "nature of the deportment" was such as "to offend personal sensitivities of the judge," 343 U.S. at 5, 72 S.Ct. at 453, and quotes a paragraph from a Court of Appeals decision which found that the trial judge had been "exposed to offensive slights and insults." 343 U.S. at 4, 72 S.Ct. at 453, quoting from United States v. Den-

nis, 183 F.2d 201, 226 (2d Cir. 1950). In his dissenting opinion, Justice Frankfurter stated that "[a] reading of the fifteen volumes of testimony in the *Dennis* record leaves one with the strong feeling that the conduct found contemptuous was in the main directed against the trial judge personally and that the judge himself so regarded it. In the preamble of his contempt certificate he states that one of the purposes of the nefarious agreement with which he charged the lawyers was 'impairing my health so that the trial could not continue.'" 343 U.S. at 33, 72 S.Ct. at 466–467 (dissenting opinion). Justice Frankfurter proceeded to quote from the trial judge's specifications

*Sacher* was like *Cooke* in two important respects: First, since the trial judge waited until after the completion of the trial before convicting the attorneys, the policy of preserving order in the courtroom could not justify summary proceedings; and, second, the alleged contempt entailed a personal attack on the trial judge. *Sacher* was different from *Cooke*, however, in that the alleged contempt occurred in the presence of the trial judge. The second policy which Chief Justice Taft had identified but found inapplicable in *Cooke* (the waste of resources justification) was, therefore, apparently applicable in *Sacher*.[9]

The Supreme Court affirmed the contempt convictions of Sacher and his fellow counsel. Mr. Justice Jackson, writing for the majority, held that summary disposition after trial was appropriate under Rule 42(a), and that it was not improper for the trial judge to have punished the contemnors after having been personally attacked.

On the first point, Justice Jackson wrote that the waste of resources justification *in and of itself* justified summary disposition under Rule 42(a):

> We think "summary" as used in this Rule does not refer to the timing of the action with reference to the offense but refers to a procedure which dispenses with the formality, delay and digression that would result from the issuance of process, service of complaint and answer, holding hearings, taking evidence, listening to arguments, awaiting briefs, submission of findings, and all that goes with a conventional court trial. The purpose of that procedure is to inform the court of events not within its own knowledge. The Rule allows summary procedure only as to offenses within the knowledge of the judge because they occurred in his presence. 343 U. S. at 9, 72 S.Ct. at 455.

Justice Jackson justified this holding on two grounds. First, he stated that since Rule 42(a) clearly would have authorized summary punishment for the contemptuous conduct immediately upon its occurrence, "no possible prejudice to . . . [the contemnors] can result from delaying it until the end of the trial if the circumstances permit such delay."[10] Indeed, he argued, the postponement of punishment might work to the contemnors' benefit by giving the trial judge a "cooling off" period.[11] And, second, Justice Jackson contended that, in the case of an *attorney's* contemptuous conduct, postponing convic-

---

against the contemnors, which alleged that they:

"b. Suggested that various findings by the Court were made for the purpose of newspaper headlines;

"c. Insinuated that there was connivance between the Court and the United States Attorney;

.    .    .    .    .

"f. Urged one another on to badger the Court;

"g. Repeatedly made charges against the Court of bias, prejudice, corruption, and partiality;

.    .    .    .    .

"l. Accused the Court of racial prejudice without any foundation; . . . .
343 U.S. at 33–34, 72 S.Ct. at 467 (dissenting opinion)

9. We use the word "apparently" in light of the discussions of Offutt v. United States, 348 U.S. 11, 75 S.Ct. 11, 99 L. Ed. 11 (1954), and Mayberry v. Pennsyl-

vania, 400 U.S. 455, 91 S.Ct. 499, 27 L. Ed.2d 532 (1971), *infra*. It is clear, however, that the Court in *Sacher* assumed the waste of resources justification to be applicable.

10. 343 U.S. at 10, 72 S.Ct. at 455. He had previously stated that "[p]etitioners do not deny that they might have been summarily punished for their conduct without hearing under Rule 42(a) if the trial judge had acted at once upon occurrence of each incident." *id.* at 7, 72 S. Ct. at 454.

11. "If we were to hold that summary punishment can be imposed only instantly upon the event, it would be an incentive to pronounce, while smarting under the irritation of the contemptuous act, what should be a well-considered judgment. We think it less likely that unfair condemnation of counsel will occur if the more deliberate course be permitted." 343 U.S. at 11, 72 S.Ct. at 456.

tion until after trial might be necessary in order to prevent prejudice to his client.[12]  He concluded:

> We hold that Rule 42 allows the trial judge, upon the occurrence in his presence of a contempt, immediately and summarily to punish it, if, in his opinion, delay will prejudice the trial. We hold, on the other hand, that if he believes the exigencies of the trial require that he defer judgment until its completion he may do so without extinguishing his power.

343 U.S. at 11, 72 S.Ct. at 456.

Regarding the factor of personal attack on the trial judge, Justice Jackson held, in one paragraph, that it did not require his disqualification:

> The Rule itself expresses no such limitation, and the contrary inference is almost inescapable.  It is almost inevitable that any contempt of a court committed in the presence of the judge during a trial will be an offense against his dignity and authority.  At a trial the court is so much the judge and the judge so much the court that the two terms are used interchangeably in countless opinions in this Court and generally in the literature of the law, and contempt of the one is contempt of the other.  It cannot be that summary punishment is only for such

minor contempts as leave the judge indifferent and may be evaded by adding hectoring, abusive and defiant conduct toward the judge as an individual.  Such an interpretation would nullify, in practice, the power it purports to grant.

343 U.S. at 12, 72 S.Ct. at 456.

In short, what had seemed to the *Cooke* Court to be a weighty policy factor had become, to the *Sacher* Court, an unworkable distinction which, if given effect, would hamper the purposes of Rule 42(a).[13]

*Sacher,* then, goes far towards effectuating the policies favoring summary disposition of contempt charges arising out of conduct occurring in the presence of the trial judge.  In sustaining summary disposition when only one of the two policies (the waste of resources justification) was found to be applicable, Justice Jackson's majority went further than the Court in *Cooke* had indicated would be appropriate.[14]  Moreover, in holding that the factor of personal attack is outweighed by the *single* policy against wasting resources, *which is presumably applicable whenever the literal terms of Rule 42(a) are met (i.e.,* whenever the contemptuous conduct has occurred in the presence of the trial judge), the Court indicated that person-

---

12.  Mr. Justice Jackson recognized that the lawyer might be cited "out of the presence of the jury, but we have held that a contempt judgment must be public.  Only the naive and inexperienced would assume the news of such action will not reach the jurors."  He went on to note that "[i]f the court were required also then to pronounce sentence, a construction quite as consistent with the text of the Rule as petitioners' present contention, it would add to the prejudice.  It might also have the additional consequence of depriving defendant of his counsel unless execution of prison sentence were suspended or stayed as speedily as it had been imposed."  343 U.S. at 10, 72 S.Ct. at 455–456.

13.  The *Sacher* resolution of the disqualification issue is technically not inconsistent with the narrow holding in *Cooke,* since in the latter case the personal at-

tack factor was the only applicable policy (neither policy favoring summary disposition being applicable), while in the former case the waste of resources justification for summary disposition was found to be applicable and in conflict with the personal attack factor, which it was found to outweigh.  *Sacher,* in other words, did not overrule *Cooke* in the sense that Justice Jackson did not indicate that *Cooke* would no longer be controlling in cases where neither pro-summary policy is applicable.  It is clear from the paragraph quoted above, however, that *Sacher* represents a change in the direction in which the *Cooke* Court had appeared to be headed on the disqualification issue.

14.  In a brief reference, Justice Jackson distinguished *Cooke* on the grounds that it was decided prior to the adoption of Rule 42(a).

al attack on the trial judge could *never* extinguish the judge's power under the rule, even after the trial has been completed.

If *Sacher* were the latest word on the subject from the Supreme Court, affirmance of appellant's conviction would be in order. More recent Supreme Court opinions, however, convince us that *Sacher* is not controlling in this case.

**2. *Effectuating Due Process Policies: Withdrawal from Sacher***

■ As a general proposition, due process of law requires that an accused person be afforded an adjudication by an impartial judge. The Supreme Court has recognized that this attribute of due process can be threatened in contempt cases in (1) situations in which the alleged contempt consists of a *personal attack* on the trial judge, of such a nature that the judge actually becomes embroiled in a personal dispute with the alleged contemnor, or that a "normal" judge would likely be personally affected even though his feelings remain under control, and (2) situations in which the judge adopts an adversary posture with respect to the defendant, even in the absence of a personal attack.

**a. *Personal attack leading to actual embroilment or the likelihood of personal involvement***

Less than three years after *Sacher*, Justice Jackson's resolution of the disqualification issue was sharply limited in *Offutt v. United States*, 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11 (1954). *Offutt* concerned an attorney who was

summarily convicted of contempt after the jury had retired to deliberate in an abortion case against his client. The fourteen day trial had been marked by "an intermittently continuous wrangle on an unedifying level," 348 U.S. at 17, 75 S.Ct. at 15, between the trial judge and the alleged contemnor. Relying on Rule 42(a) and *Sacher*, the judge had found Offutt guilty of twelve certifications of "contumacious and unethical conduct in open court during the trial," and ordered him committed to custody for ten days. On appeal, this court reduced the sentence to 48 hours, viewing his conduct in the light of the trial judge's own provocations. *See* Offutt v. United States, 93 U.S.App.D.C. 148, 208 F.2d 842 (1954). The Supreme Court granted certiorari in the exercise of its " 'supervisory authority over the administration of criminal justice in the federal courts . . . .' " 348 U.S. at 13, 75 S.Ct. at 13.

*Offutt*, then, was identical to *Sacher* in the following respects: It concerned a *summary* contempt conviction of an attorney, rendered by a *federal trial judge, after the completion of the trial*,[15] for conduct which *occurred in his presence*, and which had *"personal overtones."* 348 U.S. at 12, 75 S.Ct. 11, 99 L.Ed. 11. In fact, the only material difference between *Sacher* and *Offutt* is that in the latter case the trial judge clearly became "personally embroiled with the petitioner," 348 U.S. at 17, 75 S.Ct. 11, 99 L.Ed. 11, while in the former case there was disagreement on that score.[16]

---

15. Although the verdict had not yet been rendered, the jury had retired to deliberate. Thus, for purposes of the policy of preserving order in the courtroom, the trial was complete.

16. The majority opinion in *Sacher* quoted the appeals court to the effect that the judge, "if at times he did not conduct himself with the imperturbability of a Rhadamanthus, showed considerably greater self-control and forbearance than it is given to most judges to possess." 343 U.S.

at 4, 72 S.Ct. at 453, quoting from 183 F.2d at 226. On the other hand, Justice Black stated in dissent that aspects of the trial judge's conduct were "a drastic deviation from the desirable judicial standard," 343 U.S. at 17, 72 S.Ct. at 459, and Justice Frankfurter, also dissenting, stated that "[a]t frequent intervals in the course of the trial his comments plainly reveal personal feeling against the lawyers, however much the course of the trial may have justified such feeling." 343 U.S. at 34, 72 S.Ct. at 467.

Despite the similarity to *Sacher*, the Supreme Court reversed Offutt's conviction and remanded for a hearing before a different judge. Disregarding the *Sacher* Court's reluctance to look to *Cooke* because it was decided prior to the adoption of Rule 42,[17] Mr. Justice Frankfurter, writing for the majority, addressed the disqualification issue as follows:

> The pith of this rather extraordinary power [embodied in Rule 42(a)] to punish without the formalities required by the Bill of Rights for the prosecution of federal crimes generally, is that the necessities of the administration of justice require such summary dealing with obstructions to it. It is a mode of vindicating the majesty of law, in its active manifestation, against obstruction and outrage. The power thus entrusted to a judge is wholly unrelated to his personal sensibilities, be they tender or rugged. But judges also are human, and may, in a human way, quite unwittingly identify offense to self with obstruction to law. Accordingly, this Court has deemed it important that district court judges guard against this easy confusion by not sitting themselves in judgment upon misconduct of counsel where the contempt charged is entangled with the judge's personal feeling against the lawyer.
>
> Of course personal attacks or innuendoes by a lawyer against a judge, with a view to provoking him, only aggravate what may be an obstruction to the trial. The vital point is that in sitting in judgment on such a misbehaving lawyer the judge should not himself give vent to personal spleen or respond to a personal grievance. These are subtle matters, for they concern the ingredients of what con-

stitutes justice. Therefore, justice must satisfy the appearance of justice.

> Duly mindful of the fact that the exercise of the power of summary punishment for contempt "is a delicate one, and care is needed to avoid arbitrary or oppressive conclusions", this Court in Cooke v. United States, [*supra*], without in the slightest condoning contemptuous behavior on the part of a lawyer, deemed it desirable that "where conditions do not make it impracticable, or where the delay may not injure public or private right, a judge, called upon to act in a case of contempt by personal attack upon him, may, without flinching from his duty, properly ask that one of his fellow judges take his place. [Citation omitted.] "

348 U.S. at 14–15, 75 S.Ct. at 13–14.

Several aspects of this passage should be noted. First, the turn away from the *Sacher* view of the personal attack factor is clear. What had seemed to the *Sacher* Court to be an unworkable distinction was to the *Offutt* Court, as it had been to the *Cooke* Court, an essential one to make: The trial judge must distinguish "offense to self" from "obstruction to law."

Second, in discussing the rationale of the summary contempt power embodied in Rule 42(a), Justice Frankfurter omitted reference to the waste of resources justification, referring exclusively to the necessity of removing obstructions to the administration of justice. This may indicate a return to the view of Chief Justice Taft in *Cooke* that the waste of resources justification alone cannot justify summary contempt proceedings, the need to preserve order in the courtroom being an essential prerequisite. *Offutt* may thus indicate that summary proceedings are never appropriate after the

17. "Rule 42(a) was not an innovation. It did not confer power upon district judges not possessed prior to March 21, 1946. . . . 'This rule,' the Advisory Committee on the rules of criminal procedure stated, 'is substantially a restatement of existing law, Ex parte Terry, 128 U.S. 289, [9 S.Ct. 77, 32 L.Ed. 405;] Cooke v. United States, 267 U.S. 517, 534, [45 S.Ct. 390, 69 L.Ed. 767].' " 348 U.S. at 13–14, 75 S.Ct. at 13.

completion of the trial, when the policy of preserving order is by definition inapplicable.

Third, and most important, is the reason why the Court in *Offutt* did not have to decide that issue (*i. e.*, the issue of whether the waste of resources justification alone can support summary disposition after trial). The reason is that the *waste of resources justification is inapplicable when the trial judge has become embroiled in a personal dispute* with the alleged contemnor. The justification presupposes that the trial judge is a competent factfinder, for only on that assumption is it a useless formality to hold a hearing to inform him of the facts. The Court in *Offutt* recognized, however, that when a trial judge has become personally embroiled with an alleged contemnor, he may no longer be "competent" to find and interpret the facts relating to the alleged contempt. Because he is no longer disinterested and unbiased, his perception and judgment may be distorted. Thus, wrote Justice Frankfurter in the passage excerpted above, he may *"quite unwittingly* identify offense to self with obstruction to law." (Emphasis added.) Far from being a useless formality, a hearing is necessary in such circumstances so that the facts can be objectively determined.

In essence, then, the Court in *Offutt* reached the same conclusion that it had in *Cooke*. *Neither* of the policies favoring summary disposition was applicable: The policy of preserving order was inoperative because the trial was completed; and the policy against wasting resources was inapplicable by reason of the trial judge's personal involvement. The only relevant consideration was the factor of personal embroilment. Nonsummary disposition before a different judge was therefore clearly appropriate.[18]

As we have noted, *Offutt* may indicate that the policy of preserving order is an essential prerequisite for the imposition of summary punishment, and that summary proceedings are therefore never appropriate after the completion of the trial; because the Court found, however, that both policies favoring summary disposition were inapplicable, that aspect of the case is uncertain. What is certain, however, is that summary disposition after trial is not available when the trial judge has become personally engaged with the alleged contemnor. That this represents an overruling, *sub silentio,* of *Sacher* in this regard is clear, unless *Offutt* is limited to situations in which there is evidence of actual embroilment on the part of the trial judge, and *Sacher* distinguished on the grounds that there was no such evidence in that case (despite the dissenting opinions).

Any possibility of thus limiting *Offutt*, however, appears to have been precluded by Mayberry v. Pennsylvania, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971), decided after the happening of the events in issue here. There the petitioner was a layman who represented himself before a state trial court against charges of prison breach and holding hostages in a penal institution. The petitioner's conduct during the twenty-one day trial was described as "shock[ing] to those raised in the Western tradition that considers a courtroom a hallowed place of quiet dignity as far removed as possible from the emotions of the street." *Id.* at 456, 91 S.Ct. at 500. He had "cruelly slandered" the trial judge with "downright insults" and "fighting words." Following a jury verdict of guilty, the judge summarily convicted petitioner of criminal contempt.

*Mayberry*, then, was like *Offutt* in that it concerned a contempt conviction which was rendered by the trial judge

18. Although the decision in *Offutt* was cast in terms of an exercise of the Supreme Court's supervisory power over the federal judiciary, the opinion is couched in the language of due process. Mayberry v. Pennsylvania, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971), to which we will soon turn, makes clear that the holding in *Offutt* rests on the due process clause, as well as on the supervisory power.

after the completion of the trial, and related to conduct occurring in the presence of the trial judge which entailed a personal attack on him. The two cases were different, however, in that the trial judge in *Offutt* became outwardly embroiled in a personal controversy with the alleged contemnor, while the judge in *Mayberry* "was not an activist seeking combat." *Id.* at 465, 91 S.Ct. at 505.

All nine justices voted to reverse Mayberry's contempt conviction. Mr. Justice Douglas, writing for the Court,[19] first suggested that the better course of action by the trial judge would have been to summarily convict the contemnor immediately after the contempt occurred. He noted that the cautionary factor identified by the Court in *Sacher* —the likelihood that instant conviction of a lawyer will prejudice his client—is inapplicable in the case of contempt by a defendant who, like Mayberry, undertakes to represent himself.

Recognizing that this suggestion would restrict the alternatives approved for use by trial judges in *Sacher*, Justice Douglas continued:

"[g]eneralizations are difficult. Instant treatment of contempt where lawyers are involved may greatly prejudice their clients but it may be the only wise course where others are involved. Moreover, we do not say that the more vicious the attack on the judge the less qualified he is to act. A judge cannot be driven out of a case. Where, however, he does not act the instant the contempt is committed, but waits until the end of the trial, on balance, it is generally wise where the marks of the unseemly conduct have left personal stings to ask a fellow judge to take his place. What Chief Justice Taft said in Cooke v. United States, 267 U.S. 517, 539, [45 S.Ct. 390, 69 L.Ed. 767,] is relevant here:
[Mr. Justice Douglas then quoted the passage from *Cooke* which we have excerpted on page 832 *supra*.]

We conclude that that course should have been followed here, as marked personal feelings were present on both sides. *Id.* at 463–464, 91 S.Ct. at 504.

On a first reading, it is difficult to understand Justice Douglas' use of the phrase "marked personal feelings . . . on both sides," since it was clear that the trial judge had not reacted to the petitioner's outbursts in an unseemly manner. On the subsequent page, however, Justice Douglas made his meaning clear:

[A] judge, vilified as was this Pennsylvania judge, *necessarily* becomes embroiled in a running, bitter controversy. No one so cruelly slandered is likely to maintain that calm detachment necessary for fair adjudication. *Id.* at 465, 91 S.Ct. at 505 (emphasis added).

In other words, once a judge has been personally attacked in such a manner that a judge of ordinary sensibilities might naturally be expected to harbor "marked personal feelings" against the attacker, *the law must assume that such feelings exist,* even though the judge, through admirable forbearance, gives no outward indication that he has been personally affected. This assumption is necessary, presumably, for two reasons. First, personal animosity may in fact exist in a judge who is outwardly unperturbed; and, second, even if the judge possesses singularly charitable instincts and in fact entertains no personal feelings, the public might reasonably suspect that such was not the case. In this latter situation, disqualification would be necessary in order to protect the integrity of the judiciary—so that "justice . . . [can] satisfy the appearance of justice." *Id.* at 465, 91 S.Ct. at 505, quoting *Offutt*, 348 U.S. at 14, 75 S.Ct. 11, 99 L.Ed. 11.

In sum, it is of no significance that a trial judge who has been personally attacked has remained outwardly calm, so long as the attack is such that his personal feelings might reasonably be ex-

---

19. Justices Burger, Black, and Harlan filed concurring opinions.

pected to have been affected. In terms of the policies supporting summary disposition, such an attack renders the waste of resources justification inapplicable, just as actual embroilment rendered that justification inapplicable in *Offutt*. The attack itself makes it unlikely that the trial judge is a competent factfinder with respect to the alleged contempt; and it cannot be said, therefore, that a hearing would necessarily be a useless formality.

Since a personal attack necessarily renders the waste of resources justification inapplicable, summary disposition is appropriate, when there has been a personal attack, only if the policy of preserving order in the courtroom is applicable, that is, only if the contempt is punished immediately after it occurs.[20] Because the trial judge in *Mayberry* had waited until the completion of the trial, it was not open to him to summarily convict the petitioner. Due process of law required that he be afforded "a public trial before . . . another judge, not bearing the sting of these slanderous remarks and having the impersonal authority of the law." *Id.* at 466, 91 S.Ct. at 505.

*Mayberry* involved the application of the due process clause to a *state* summary contempt conviction. The holding is equally controlling in respect of federal procedures otherwise authorized by the literal terms of Rule 42(a). As we have seen, *Mayberry* is merely a logical extension of the holding as to the inapplicability of the waste of resources justification in *Offutt*, which was decided under Rule 42(a). Moreover, Justice Douglas stated that "[w]hether the trial be federal or state, the concern of due process is with the fair administration of justice," *id.* at 465, 91 S.Ct. at 504, clearly implying that the Court will construe Rule 42 consonantly with the requirements of due process.[21]

Some alleged contempts do not invoke the *Mayberry* doctrine, despite the existence of "personal overtones." Ungar v. Sarafite, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964). *Ungar* involved the failure of a witness in a state criminal trial to answer questions put to him by the prosecution, despite the fact that he had been granted transactional immunity. When the trial judge instructed him to answer, he refused, claiming that he was being "coerced and intimidated and badgered," and that the judge was "suppressing the evidence." *Id.* at 580, 84 S.Ct. 841. The judge replied that Ungar was "not only contemptuous but disorderly and insolent"; and, in a *non*summary proceeding held several days after the completion of the trial, convicted Ungar of contempt.

In the Supreme Court, Ungar attacked the validity of his contempt conviction on the grounds that "his contemptuous remarks were a personal attack on the judge which necessarily, and without more, biased the judge and disqualified him from presiding at the post-trial contempt hearing." *Id.* at 583, 84 S.Ct. at 846. The Court rejected that contention. Anticipating *Mayberry*, it assumed "that there are criticisms of judicial conduct which are so personal and so probably productive of bias that the judge must disqualify himself," *id.*, but

20. As we have noted above, Justice Douglas suggested that this would have been the preferable course of action in *Mayberry*. *See also* Part III, infra.

21. We might add, finally, that the *Mayberry* resolution of the disqualification issue cannot be limited to cases involving contemptuous conduct by laymen, as opposed to trial lawyers. In his determination of the disqualification issue, Justice Douglas relied heavily on *Cooke* and *Offutt*, both of which, as we have seen, concerned conviction of an attorney. Any distinction between contempts by laymen and attorneys in *Mayberry* relates only to the feasibility of summary conviction immediately after the contemptuous conduct has occurred. *Mayberry* indicated that a trial judge confronted with a contemptuous layman should be inclined to react more quickly than when confronted by a contemptuous lawyer, since, as *Sacher* indicated, instant conviction of the lawyer might well prejudice his client.

held that Ungar's conduct was not sufficiently personal to invoke the doctrine. Ungar's refusal to answer questions was said to be clearly impersonal, and his accompanying statements were characterized as "disruptive, recalcitrant and disagreeable commentary, but hardly an *insulting attack upon the integrity of the judge* carrying such potential for bias as to require disqualification." *Id.* at 584, 84 S.Ct. at 847. (emphasis added). As for the trial judge's own characterization of Ungar's conduct, the Court found this to be "at most a declaration of a charge against the petitioner, based on the judge's observations, which, without more, was not a constitutionally disqualifying prejudgment of guilt." *Id.* at 587, 84 S.Ct. at 848–849.

*Ungar,* in short, does not repudiate the due process notion that a personal attack can require disqualification of the trial judge, but rather indicates that some comments about the trial judge, viewed in context, are not sufficiently personal to invoke the doctrine that has since been embodied in *Mayberry.*

b. *Adversary posture of the trial judge vis a vis the alleged contemnor*

The due process requirement of disposition by an impartial judge is threatened, not only when the contempt is of such a personal nature as to create actual embroilment or the likelihood of personal engagement of the feelings of the trial judge, but also when the judge adopts an adversary posture with respect to the alleged contemnor, even if he has not been personally attacked. In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955). *Murchison* concerned contempt convictions arising from a procedure by which Michigan state judges were authorized to act as "one-man grand juries," with power to compel witnesses to appear before them in secret to testify about suspected crimes. The two petitioners in that case had been interrogated by a judge acting in such a capacity. The judge, being convinced that they had committed contempt during the secret proceedings, subsequently convicted them after a hearing in open court.

The Supreme Court reversed the convictions and remanded for proceedings before a different judge, holding that a judge who functions as a grand jury is too much "a part of the accusatory process" to be "wholly disinterested in the conviction or acquittal of those accused [as a result of his investigations]." *Id.* at 137, 75 S.Ct. at 625, 626. He may view them, not from the vantage point of a disinterested observer, but in an adversary posture. There was, therefore, a sufficient possibility of bias to make disqualification necessary to preserve the integrity of the judiciary, even though "[s]uch a stringent rule may sometimes bar trial by judges who have no actual bias." *Id.* at 136, 75 S.Ct. at 625.

Although *Murchison* concerned disqualification in *non*summary contempt proceedings, the issue of disqualification and the issue of whether summary proceedings are permissible are closely interrelated. The same factor—the possibility of personal bias—militates in favor of *both* disposition by a different judge and nonsummary proceedings (by rendering inapplicable the waste of resources justification for summary proceedings). Moreover, since under Rule 42(a) summary proceedings can be undertaken only by the trial judge, any factor which requires disqualification of the trial judge also requires nonsummary disposition. Thus, although *Murchison* dealt with the disqualification issue alone, its necessary implication is that whenever disqualification is required by reason of the judge's adversary posture, nonsummary disposition is also required.[22]

22. For this reason, presumably, Justice Douglas relied on *Murchison* in *Mayberry*. Appropriately, he adopted in *Mayberry* as the standard for requiring non-summary disposition the same standard which Justice Black had announced in *Murchison*—reasonable likelihood that personal bias exists.

The Supreme Court reaffirmed this principle last term in Johnson v. Mississippi, 403 U.S. 212, 91 S.Ct. 1778, 29 L. Ed.2d 423 (1971). Johnson was a criminal defendant in a Mississippi state court who allegedly disobeyed a court order regulating entrance into the courtroom. The trial judge did not punish him instantly, but, after a considerable delay, summarily convicted him of contempt. During the period between the alleged contempt and the summary conviction, Johnson had filed a suit in federal court to enjoin alleged discrimination in jury selection in state courts, naming the trial judge as a defendant.[23]

In a *per curiam* opinion, the Supreme Court unanimously reversed the contempt conviction and remanded for a hearing before a different judge:

> Beyond all that was the fact that . . . [the trial judge] immediately prior to the adjudication of contempt was a defendant in one of petitioner's civil rights suits and a losing party at that. From that it is plain that he was so enmeshed in matters involving petitioner as to make it most appropriate for another judge to sit. Trial before "an unbiased judge" is essential to due process. . . . Mayberry v. Pennsylvania [supra].

403 U.S. at 215–216, 91 S.Ct. at 1780.

Thus, the trial judge, by virtue of his status as a defendant in a suit brought by the alleged contemnor, was in an adversary posture with respect to him, and was presumptively biased. This is true even though the judge's status as an adversary party was created by an action of the alleged contemnor (filing suit), just as presumptive bias was created in *Mayberry* through an action of the alleged contemnor (personal attack).

### III

Our understanding of the state of Supreme Court decisional law relating to procedures for adjudicating contempt charges is as follows:

■ In the case of a summary contempt conviction rendered by the trial judge, the first issue is whether the necessary condition for summary disposition is present, namely, whether the alleged contemptuous conduct occurred in the presence of the trial judge. In cases involving federal trials, this condition is required by Rule 42(a). But, as *Cooke* indicates, Rule 42(a) in this respect merely incorporates a requirement of due process.

■ Once it has been determined that the allegedly contemptuous conduct occurred in the presence of the trial judge, there is a presumption that the waste of resources justification for summary disposition is operative. This presumption is, however, rebuttable; and we have seen three situations in which that justification fails. The trial judge cannot be presumed to be a competent factfinder when (1) he has become personally embroiled with the alleged contemnor, as in *Offutt;* (2) he has been attacked in such a way that the personal feelings of a normal judge might reasonably be expected to have been affected, as in *Mayberry;* or (3) he has adopted an adversary posture with respect to the alleged contemnor, as in *Murchison* and *Johnson.*

■ The other policy justification for summary disposition—the need to preserve order in the courtroom—is by definition inapplicable after the trial is over. Therefore, if the waste of resources justification is inapplicable by reason of one of the three factors just mentioned, the trial judge may not employ summary procedures after trial. In such cases, there is no conflict between competing policy considerations, for neither of the policies favoring summary disposition is applicable. The normal constitutional presumption in favor of a due process hearing is therefore controlling. *Offutt; Mayberry; Johnson.* Also in such cases, the factor which renders the waste of resources justification

---

23. The federal court issued a temporary injunction against the alleged jury discrim-

ination two days before the trial judge summarily convicted Johnson.

inapplicable—the existence or reasonable likelihood of personal bias on the part of the trial judge—requires that the nonsummary proceeding be conducted by a different judge. *Id.*[24]

In the foregoing instances, there is, as noted, no need to weigh competing policies, because neither of the policies favoring summary disposition is applicable. There are situations, however, in which those policies are present, and do conflict with policies favoring nonsummary disposition by a different judge.

■■ First, a conflict may exist in the case of summary conviction at trial —immediately after the allegedly contemptuous conduct has occurred. In such situations, it is clear that if the trial judge deems summary conviction necessary to preserve order in the courtroom and to protect the authority of the court, summary conviction is proper. And this is presumably true even if the judge has evidenced personal embroilment or has been personally attacked. In such cases, as Justice Douglas made clear in *Mayberry* by suggesting that

summary conviction would have been the preferred response of the trial judge in that case, the need to preserve order, by itself, not only supports summary disposition, but also outweighs the possibility of bias on the part of the trial judge. Trial judges are allowed wide discretion in determining when the necessity of preserving order is paramount. Once the determination is made, the contemnor's substantive arguments, which would normally be aired at a hearing at the trial level, must be saved for decision on appeal.

A conflict of policies may arise, second, in cases in which the trial judge waits until after trial before summarily convicting an alleged contemnor, but in which there has been no embroilment, personal attack, or adoption of an adversary posture. In such cases, although there is no longer any need to preserve order in the courtroom, the waste of resources justification for summary disposition *is* applicable, and conflicts with the constitutional presumption in favor of a due process hearing. The law governing such a conflict is not clear,[25] but

24. In short, *Sacher* does not control in these situations. Not only has the Supreme Court reached a different result in situations indistinguishable from *Sacher*, but also, in doing so, it has discredited the reasoning on which that decision was based. Whereas *Sacher* held that the waste of resources justification outweighed the due process policies, *Offutt* and *Mayberry* show that there is no waste of resources justification in cases involving embroilment or personal attack—the conflict of policies in *Sacher* was a "false conflict."

Moreover, the justifications given for the holding in *Sacher* are unpersuasive. It will be recalled that Justice Jackson first noted that, since summary punishment would have been appropriate immediately after the contemptuous conduct, there could be no prejudice to the alleged contemnors in waiting until the end of the trial. Later cases seem to recognize, however, that there is an inherent risk of prejudice whenever summary procedures are employed, and that they are therefore permissible only when justified by important policies. The reason that summary conviction would have been permissible at trial in *Sacher*, as we will shortly note,

is that an important policy would have outweighed the inherent risk of prejudice. It does not follow from that proposition, however, that there is no possible prejudice in summary proceedings after trial. The inherent risk remains.

It will be recalled, second, that Justice Jackson justified the *Sacher* holding on the grounds that delay may be necessary to avoid prejudice to a lawyer-contemnor's client. But it should be obvious that that factor supports only the delay; it is irrelevant to the nature of the proceedings which occur after the delay.

25. *Ungar* indicates that there is no need for the trial judge to disqualify himself; but, since a hearing was provided in that case, the Supreme Court did not address the issue of whether the judge could have proceeded summarily.

*Sacher* held that the waste of resources justification, by itself, is sufficient to justify summary disposition by the trial judge after trial. Although that policy was in fact inoperative in that case, the holding might be thought to remain viable in cases in which it is relevant. On the other hand, the Court in *Offutt* omitted reference to the waste of resources justification

we are not required to resolve that issue in this case.

## IV

Given the foregoing, it appears to us that the Supreme Court has, certainly by the supervening authority of *Mayberry*,[26] foreclosed to the trial judge the option of summarily convicting appellant after the completion of the trial in this case. Since he waited until after trial, the policy of preserving order was by definition inapplicable; and the waste of resources justification was inapplicable by reason of the possibility of bias stemming from a personal attack.[27] Although the trial judge appears to have behaved with great restraint in the face of a temptation to personal embroilment, we find the *Ungar* threshold to be met, and the *Mayberry* doctrine invoked, by the personal nature of the alleged contempt.

There is, first, the trial judge's own characterization of the appellant's conduct, found in the contempt certificate. There the judge depicted appellant's acts as "insulting, derogatory, and disrespectful," and alleged that appellant "engaged in disrespectful conduct which offended the dignity and decorum of the court and of this proceeding and which was degrading to this tribunal."

While this characterization by the judge suggests that he viewed the alleged contempt as having "personal overtones," it alone does not constitute a sufficient showing that the *Ungar* standard is met. We are reluctant to

ground our holding on the difference between the *Ungar* "disorderly and insolent," on the one hand, and the present "insulting, derogatory, and disrespectful," on the other. We have, accordingly, examined the record to see if the conduct which is allegedly contemptuous is sufficiently personal to invoke the *Mayberry* doctrine.

Our search did not have to go further than the conduct which is the subject of the first specification of contempt. The portions of the transcript to which this specification refers contain remarks by appellant to this effect:

> The problem is that you made it [your mind] up before you ever came to this courtroom. . . . I fully believe, and with all due respect to the Court as a person, that you made up your mind about everything except the length of the sentence. . . . I am terribly afraid that you have made up your mind that you are going to dispatch this case as expeditiously as possible. I am not here to expedite it. I will do it with all the dignity of a lawyer and all the sanctions of the bar in mind, but I will not take part in greasing the wheels, not of justice, but the wheels of expeditiously packing these nine people off to jail as quickly as we can.

We imply nothing as to whether these remarks constitute contempt of the trial court. But we do think that this *alleged* contempt is sufficiently personal to invoke the *Mayberry* doctrine. A charge that a trial judge has determined that a

---

in discussing the rationale of Rule 42(a), referring exclusively to the need to preserve order. *Offutt* may indicate, therefore, that summary disposition is never appropriate after trial.

26. It is reliably reported that, with the advent of *Mayberry*, the United States Attorney for the Northern District of Illinois moved to reverse the contempt citations of the so-called Chicago Seven, and asked that they be set for hearing before a judge other than the trial judge. Kalven, Forward, The Supreme Court, 1970 Term: Even When a Nation Is at at War, 85 Harv.L.Rev. 3, n. 61 (1971).

27. We note, but find it unnecessary to resolve, the question of whether the judge may be thought to have adopted an adversary posture with respect to appellant within the purview of *Murchison* and *Johnson*, by reason of his filing a complaint with the Committee on Admissions and Grievances the day after the conviction and his subsequent appearance as the sole complaining witness before that body. Unlike *Murchison* and *Johnson*, these events took place after the judge had completed his contempt action; and we do not find it necessary to pursue the matter further in the light of the disposition we make.

defendant is guilty before presiding over his criminal trial, and that he is interested only in expeditiously dispatching the defendant to prison, is, in the language of the Government's brief, an "attack upon a court's integrity and impartiality."

To characterize the alleged contempt in that manner, however, is to distinguish *Ungar*. As we noted in our discussion of that case, the Supreme Court characterized the remarks of the contemnor as "disruptive, recalcitrant, and disagreeable commentary, *but hardly an insulting attack upon the integrity of the judge*." (emphasis added). Here, in contrast, we have an attack on the judge's integrity—not mere resistance to, and criticism of, his rulings.

In fact, appellant's alleged contempt is essentially similar to the contempt at issue in *Cooke*, which was found to be sufficiently personal to require disqualification of the trial judge. Cooke, like appellant, alleged that the trial judge was biased against his client. While it is true that Cooke voiced his disappointment that the judge was not "big enough and broad enough" to withdraw of his own accord, that thought is certainly implicit in appellant's remarks, since he charged that the judge was proceeding in spite of the fact that he had prejudged the case.

█ In sum, we conclude that an alleged contempt which consists of an impugnation of the integrity and impartiality of the trial judge is sufficiently personal to invoke the *Mayberry* doctrine. Appellant is entitled to have the contempts charged against him adjudicated in a full hearing before a different judge.

We hasten to add that, in reaching this result, we do not indicate a belief that the trial judge was motivated by a single purpose to convict and punish appellant, or that he was incapable of giving him fair treatment. It is enough to have concluded that the circumstances of this case do not give the *appearance* of judicial impartiality which, in order to protect both alleged contemnors and the integrity of the judiciary, must be equated with the *substance* of impartiality. "Justice," as Justice Frankfurter wrote in an oft-quoted passage in *Offutt*, "must satisfy the appearance of justice."

The case is remanded to the District Court for further proceedings consistent herewith.

It is so ordered.

TAMM, Circuit Judge (concurring):

I concur in the disposition made of this case. In doing so I distinguish this case upon a factual basis from our recent opinion in In re Brown, 147 U.S. App.D.C. ——, 454 F.2d 999 (1971). The obvious and pronounced differences between the circumstances resulting in our *Brown* opinion and the factors in the present case require me to distinguish our present case from that of *Brown*.

WILBUR K. MILLER, Senior Circuit Judge (dissenting):

I do not agree with the majority's laborious effort to reconcile the Supreme Court's decisions and so I cannot concur in the conclusion it draws from its efforts. Finespun theories as to when and how a trial judge reacts to contemptuous *courtroom conduct do not impress me.*

We should hold, I think, that the trial judge involved here had full authority to act as he did in punishing the appellant for inexcusable and outrageous behavior in the courtroom. Therefore, being of the view that the judgment appealed *from should be affirmed, I dissent.*