In re Russell Wilson CHAPLAIN, Sr.

No. 78–5154.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 7, 1980.

Decided May 7, 1980.

Douglas Fredericks, Norfolk, Va. (Fredericks & Buckley, Norfolk, Va., on brief), for appellant.

John F. Kane, Asst. U. S. Atty., Alexandria, Va. (William B. Cummings, U. S. Atty., Alexandria, Va., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and WINTER, BUTZNER, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN and SPROUSE, Circuit Judges.

K. K. HALL, Circuit Judge:

Russell Wilson Chaplain, Sr., appeals his conviction of criminal contempt summarily adjudicated by a district judge in the course of IRS subpoena enforcement proceedings against Chaplain and his daughter. We have carefully reviewed the record, have considered the controlling law relevant thereto, and affirm the conviction.

## I.

Chaplain and his daughter, Suzanne Goldsticker, appeared *pro se* in the United States District Court for the Eastern District of Virginia on May 11, 1978, as defendants in a proceeding brought by the United States seeking enforcement against them of an Internal Revenue Service subpoena.[1] During the hearing several disturbing and distracting factors and developments emerged. At the outset the district judge found it necessary to order a stenographer

---

1. The subpoena sought production of the records of several Chaplain family corporations.

privately employed by Chaplain away from a position taken, at Chaplain's direction, alongside the official court reporter.[2] Throughout the approximately two hours of proceedings that followed, Chaplain's conduct posed incredibly difficult problems of control upon the district judge. While never engaging in acts of physical obstruction or directing any overt threats, insults or calumny at the judge, Chaplain continually interrupted him and other participants in the proceeding, refused to sit down when directed to do so by the judge, badgered witnesses, evaded questions from the bench, and generally refused to observe even minimal requirements of common civility, much less the decorum traditionally expected of participants in judicial proceedings.[3] His daughter's conduct, though more moderate, was of a like kind, and while not directly involved in this contempt appeal, clearly contributed to the climate in which the critical courtroom events led to the contempt convictions. After several ineffective attempts by the trial judge to bring Chaplain into order, the judge explicitly warned him that further interruptions of the judge or uncalled for remarks directed at witnesses would result in Chaplain's confinement. This had no discernible effect on Chaplain, who continued the course of querulous, argumentative interruptions and commentary. When these developments somewhat exhausted the patience of the judge, the first summary conviction took place during the course of Chaplain's cross-examination of a Government witness.

Chaplain had asked the witness a question and then prevented his answering it, whereupon the following exchange occurred.

MR. CHAPLAIN: Judge, Your Honor, I don't want a lot of talk.

THE COURT: Mr. Chaplain, you asked the question he's answering.

MR. CHAPLAIN: Yeah, but he's answering a whole lot of strange phrases, and everything.

THE WITNESS: No. I'm just—

MR. CHAPLAIN: I just want to know: What did you all—

THE WITNESS: I'm just telling you—

THE COURT: Wait a minute. Hold it; hold it. Mr. Chaplain, let him finish answering the question.

MR. CHAPLAIN: All right, go ahead I have all day.

THE WITNESS: Anyway, Mr. Sheffer—

THE COURT: Mr. Chaplain, you're fined fifty dollars.

MR. CHAPLAIN: What for?

THE COURT: For contempt of court for a smart remark.

Moments later, the second conviction took place. When Chaplain temporarily stopped his questioning of the witness, the following occurred. We quote at some length, not because of the particular importance of the remainder of the exchange but because it is illustrative of the day's proceedings.

THE COURT: All right. You through?

MR. CHAPLAIN: No.

THE COURT: All right.

MR. CHAPLAIN: He set up there and stuttered and stammered, that other man.

I'm trying to think—

THE COURT: That's another fifty dollars.

MR. CHAPLAIN: I got—I got some more—

THE COURT: That's another fifty dollars Mr. Chaplain. That's a hundred dollars you owe.

MR. CHAPLAIN: Judge, just—Judge, just—just continue—just do whatever you're going to do.

MRS. GOLDSTICKER: Now I'm—

MR. CHAPLAIN: I just think this is unfair.

2. For the purpose, according to Chaplain, of ensuring an accurate record of the proceedings.

3. The district judge accurately described the course of conduct in his order filed pursuant to Fed.R.Crim.P. 42(a) in essentially these terms and with supporting references to the transcript.

MRS. GOLDSTICKER: Daddy— It's my turn now?

THE COURT: Well, he's—I don't know whether he's through or not.

MRS. GOLDSTICKER: Oh, excuse me.

MR. CHAPLAIN: Every time I say— what did I say then that was—

THE COURT: Every time you make a smart remark, it's going to be another fifty dollars.

You're here—up here to ask—

MR. CHAPLAIN: What—

THE COURT: —questions of this witness and not to comment on them, not to comment—

MR. CHAPLAIN: What did I say then that was a smart remark?

I mean, is this, what I'm saying now, smart?

I'm just asking: what did I say?

THE COURT: Go ahead. Ask the question, if you have any more questions.

Upon completion of the evidentiary portion of the proceedings, the district judge from the bench ordered enforcement of the subpoena, then turned to the contempt matter. Placing Chaplain in the Marshal's custody, he directed that Chaplain be taken to the Clerk's office to pay the fines, failing which he was to be confined until he made payment. Chaplain then paid the fine. Thereafter the judge entered a written order adjudging contempt in conformity with Fed.R.Crim.P. 42(a). This appeal followed.

### II.

▮ The power summarily to convict and punish for contempt of court is a general and universal attribute of judicial authority. *Ex parte Robinson,* 86 U.S. (19 Wall.) 505, 509, 22 L.Ed. 205 (1874). Inher-

ent in federal judicial power, its current use is regulated by statute and rule. *Atwell v. United States,* 162 F. 97, 102 (4th Cir. 1908).[4] The power rests on the proposition that a hearing to determine guilt of contempt is not necessary when contumacious conduct occurs in the actual presence of a judge who observes it, and when immediate action is required to preserve order in the proceedings and appropriate respect for the tribunal. If either of these conditions is not present, the use of summary contempt power may be inappropriate. *See* Dobbs, *Contempt of Court: A Survey,* 56 Cornell L. J. 183, 229 (1971).

### III.

▮ Chaplain first contends that we should reverse his conviction outright because, as a matter of law, the conduct for which he was specifically convicted and punished did not constitute contempt. He then says that in any event we should conclude as a matter of law that he could not have had the criminal intent requisite to convict him for the conduct charged. We reject both of these contentions on the basis that neither is established as a matter of law on the facts of record.

Consideration of these two issues requires that the conduct properly to be assessed as criminal contempt be first established. Relying upon *Eaton v. City of Tulsa,* 415 U.S. 697, 94 S.Ct. 1228, 39 L.Ed.2d 693 (1974) (per curiam), Chaplain contends that the conduct chargeable to him is narrowly and specifically that identified by the district judge as the basis of his adjudication of contempt, and that this consisted only of the two statements: (1) "I have all day"; and (2) "he [the witness] set up there and stuttered and stammered, that other man."[5] We do not believe that *Eaton* re-

---

**4.** 18 U.S.C. § 401(1) provides:

A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

Fed.R.Crim.P. 42(a) provides

(a) Summary Disposition. A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.

**5.** The district judge's Rule 42(a) order did specifically identify these particular utterances as the exact contumacious conduct being ad-

quires so narrow a range of inquiry into the conduct properly to be considered here. In *Eaton*, the question was whether in addition to a single street vulgarism specifically cited by a state trial judge as contumacious conduct, account could be taken by a state reviewing court of follow-up conduct by the contemnor that was not specifically cited.[6] The court held, over a vigorous dissent, that under the circumstances, allowing consideration of the uncited follow-up conduct would unconstitutionally deny due process by sustaining conviction on a charge not made. *Id.* at 699, 94 S.Ct. at 1230. A critically distinguishing factor in *Eaton* was that, even on the widest view, the contumacious conduct properly chargeable to the contemnor was limited to a fairly discrete episode that occurred suddenly and not as the culmination of a continued pattern of conduct.[7] The decision cannot therefore fairly be applied as Chaplain would have it applied to the altogether different pattern of conduct in this case. The distinguishing feature here is a course of conduct in which a series of acts of interference and disruption marks the record.

█ The summary contempt power must be able constitutionally to respond to this sort of "nibble-to-death" obstruction as well as to the sufficiently obstructive single episode. *See, e. g., In re DuBoyce*, 241 F.2d 855 (3d Cir. 1957) (per curiam); *United States v. Green*, 176 F.2d 169 (2d Cir. 1949). Applying it, however, to this pattern while protecting the contemnor's due process rights poses problems for the trial judge and for reviewing courts. Both must be concerned that fair advance warning shall have been given to a possibly unaware contemnor that a contempt conviction may ultimately result from a "last-straw" repetition of identified conduct. *See United States v. Schiffer*, 351 F.2d 91 (6th Cir.

1965); *United States v. Green*, 176 F.2d 169 (2d Cir. 1949). Both must be concerned with the responsibility of the trial judge as he tries without resorting to the contempt sanction to bring matters under control by "moral authority," *Sacher v. United States*, 343 U.S. 1, 38, 72 S.Ct. 451, 469, 96 L.Ed. 717 (1952) (Frankfurter, J., dissenting), or by less drastic coercive alternatives to contempt. See *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). One of the problems of accommodation involves that one under discussion here: the form in which cumulative conduct is to be specified by the judge convicting upon what he considers a last-straw occurrence. Both the controlling rule, Fed.R.Crim.P. 42(a),[8] and constitutional due process, see *Eaton v. City of Tulsa*, 415 U.S. 697, 94 S.Ct. 1228, 39 L.Ed.2d 693 (1974) (per curiam), enjoin upon him a fair degree of specificity in charging direct criminal contempt, even though the very nature of the summary procedure contemplates that citation, conviction and, ordinarily, punishment, will be accomplished in one fell swoop. This specificity requirement can and must be accommodated to "pattern of conduct" contempt convictions in a way adequately protective both of the inherent judicial power and individual rights. We hold that where the record reveals a pattern of potentially disruptive conduct preceding a summary conviction, the specification of a single episode adequately charges as well the entire course of like antecedent conduct from the time when it was fairly identified to the contemnor as potentially contumacious. This we think will satisfy every interest in first instance fair notice that the summary contempt power can be thought to permit, as well as fair opportunity for appellate review of the conduct upon which conviction is demon-

---

judged. But the order also carefully recited the antecedent like conduct and the prior warning given by the judge that its continuation would result in punishment. App. 1–2.

6. This consisted of disrespectful comments to the judge by the contemnor when the judge cited him for the vulgarism. The vulgarism itself was not spoken to or about the judge but about a person not involved in the trial.

7. While the Court in *Eaton* was bothered by the lack of a record of the contempt hearing itself, it had a transcript showing the cited conduct at the trial. This revealed it as a discrete episode as here described.

8. The rule requires the judge to "recite the facts" in the *post hoc* certification that confirms and records for appellate review his summary adjudication. *See* note 4 *supra*.

strably based. *Cf. Eaton v. City of Tulsa,* 415 U.S. at 699, 94 S.Ct. at 1230.[9]

Applying this rule to the instant case, we conclude that the conduct for which Chaplain was convicted is properly considered to be the entire course of his conduct from the time that the district judge warned him, App. 30, that further interruptions of the judge or unwarranted remarks to witnesses would result in his confinement. It is accordingly this range of conduct that we now assess in considering Chaplain's legal contentions.

Direct contempt justifying summary disposition is confined to exceptional circumstances involving acts "threatening the judge or disrupting a hearing or obstructing court proceedings." *Harris v. United States,* 382 U.S. 162, 164, 86 S.Ct. 352, 354, 15 L.Ed.2d 240 (1965). But it is also clear that acts having no element of violence, physical force, or vituperation may be adjudged disruptive or obstructive within this principle. *See, e. g., In re DuBoyce,* 241 F.2d 855 (3d Cir. 1957) (per curiam); *United States v. Green,* 176 F.2d 169 (2d Cir. 1949). And, as we have earlier indicated, disruption or obstruction may be found in the cumulative impact of actions no one of which standing alone could be so found. It is only necessary that a contumacious act be " 'a volitional [one] done by one who knows or should reasonably be aware that his conduct is wrongful.' " *United States v. Marx,* 553 F.2d 874, 876 (4th Cir. 1977) (quoting *United States v. Seale,* 461 F.2d 345, 368 (7th Cir. 1972)).

Upon the record we find that Chaplain's conduct and actions were disruptive and obstructive and clearly manifested the requisite criminal intent to sustain his summary contempt conviction. In the administration of justice the judiciary must have and exercise authority and power over the control and conduct of judicial proceedings. Our laws of contempt have their roots in early English history. 4 Blackstone's Commentaries 284, 285. The Judiciary Act of 1789 manifested the early concern of the Congress that the courts should have and exercise this authority and power. More recently, through enactment of our current contempt statute, 18 U.S.C. § 401, and the promulgation of Rule 42, Federal Rules of Criminal Procedure, has this continued concern been manifest. *Green v. United States,* 356 U.S. 165, 78 S.Ct. 632, 2 L.Ed.2d 672 (1958); *Gordon v. United States,* 592 F.2d 1215 (1st Cir. 1979). The record in the district court, as now before us for review, amply supports the contempt conviction and the judgment is affirmed.

*AFFIRMED.*

JAMES DICKSON PHILLIPS, Circuit Judge, concurring and dissenting:

On this appeal Chaplain raised several issues: whether the scope of the conduct charged to him in his summary convictions could properly be considered to extend past that specifically identified by the district judge at the time of the convictions; whether, properly considered as to scope, the conduct charged could properly have been adjudged to constitute direct contempt; and whether in any event the district judge who adjudged him in direct contempt was disqualified at the time to do so. The majority holds against Chaplain on each of these issues. I fully concur with the holdings and with the court's opinion on all but the last issue. On that, I respectfully disagree, believing that, regrettably, the district judge had become so openly embroiled in personal controversy with Chaplain that his impartiality to adjudge guilt was reasonably open to question and that in consequence he was disqualified to convict summarily.

9. The practical consequence of a rigid "pleading" rule of the type urged by Chaplain would likely be the classic response of pleaders through time: broadside uninformative drag- . nets, perhaps citing to the whole record, or minute recitation of every separate episode in the course of conduct. Neither is desirable or needed to protect the interests involved.

## I

As the majority rightly points out, the judicial power summarily to convict and punish for contempt of court is an inherent power based upon a fundamental necessity in the administration of justice. Maj. op. 1275. Equally fundamental, however, and undoubtedly of even more eminent heritage is the right of any person accused of crime[1] to have guilt adjudicated by an impartial tribunal. *See Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). Of necessity, in summary contempt convictions, inherent judicial power may clash with individual right. So they do here where the impartiality of a sorely-pressed trial judge to adjudicate guilt summarily was duly challenged below and here on appeal. The issue being thus squarely raised, we must try to strike the proper balance in this admittedly hard case.[2]

## II

By its very nature the summary contempt power contemplates that it shall be exercised by the judge in whose presence the contumacious conduct occurs. Accordingly, the rule governing criminal contempt proceedings literally provides for disqualification of the judge only in cases of indirect contempt where "the contempt charged involves disrespect to or criticism of [the] judge," and where a plenary proceeding may be provided. Fed.R.Crim.P. 42(b). Nevertheless, a series of Supreme Court decisions has established that disqualification may sometimes be required as well in the face of conduct constituting direct contempt. This can occur when the judge has become "so embroil[ed] . . . in controversy that he cannot 'hold the balance nice, clear and true between the state and the accused . . . .'" *Taylor v. Hayes*, 418 U.S. 488, 501, 94 S.Ct. 2697, 2704, 41 L.Ed.2d 897 (1974) (quoting *Tumey v. Ohio*, 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927)); *accord, Mayberry v. Pennsylvania*, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1975); *Offutt v. United States*, 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11 (1954).

"Embroilment" is of course simply a shorthand characterization of a complex human situation incapable of accurate general definition for all possible circumstances. Just as contumacious conduct is infinite in its possible variety, so must be the variety of conduct properly thought to constitute disqualifying embroilment of judge with contemnor. As the majority has rightly written, conduct may be contumacious without being violent, vituperative, or physically obstructive. By like token, disqualifying embroilment must be thought to include conduct not comparably dramatic. Referred to the undergirding principle of impartiality in adjudicating criminal guilt that it implements, I would consider the

1. Criminal contempt is a crime in all fundamental respects affecting the charged person's rights. *Bloom v. Illinois*, 391 U.S. 194, 201, 88 S.Ct. 1477, 1481, 20 L.Ed.2d 522 (1968).

2. I say this to emphasize my awareness of the particular kinds of difficulty presented for the trial judge in this proceeding. While the highly charged criminal trial in which aggressive defense counsel and defendants deliberately test the mettle of the judge as a trial tactic undoubtedly poses the most dramatic problems of control and maintenance of principle, some features of the proceeding in this case may pose more difficult problems. In the first place, this type of special proceeding—here the hearing of a motion to enforce a civil subpoena—as distinguished from the plenary civil or criminal trial, may invite a more informal approach in which contumacious conduct emerges gradually rather than erupting. Coupled with this was the *pro se* appearance of the two respondents with all the encouragement thereby created to avoid holding them to rigid requirements of form and decorum. Finally to be considered is the very real difficulty faced by a trial judge in assessing the motivation behind the kind of conduct involved here. Unlike the openly and palpably aggressive conduct that announces its character immediately, the sort encountered in this proceeding needs assessment while it develops to ascertain whether it proceeds from mere correctable unawareness or from contumacious design. These special difficulties must be taken into account in the application of contempt principles, but those principles must nevertheless be applied to this as any other judicial proceeding, lest the hard case make bad contempt law.

term to connote any words or actions by a trial judge that in context would convey to a disinterested and fair-minded observer of his court the definite impression that he had *at the moment of adjudication* so far lost himself in anger or irritation that he could not then "hold the balance nice, clear and true." This of course emphasizes the appearance over the fact of bias, and this it seems to me is the emphasis in the better reasoned decisions applying the principle. *See, e. g., In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955).

The logical consequence of this is plain, and should be flatly recognized: a judge may in effect lose the power of summary contempt by becoming so embroiled. *See United States v. Meyer,* 462 F.2d 827, 841 (D.C.Cir.1972). Assessing whether he has so far crossed the line that he cannot properly invoke the power lies of course with the trial judge himself in the first instance; but enforcement of the principle ultimately devolves upon the appellate courts. In this, they face the difficult task of assessing the matter on the basis of a cold written record. Undoubtedly this may sometimes lead to disservice to a conscientious trial judge, the more so because the record must be read with a view to appearances, and not to the ascertainment of actual bias. For it has been recognized that " '[s]uch a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties,' but due process of law requires no less." *Taylor v. Hayes,* 418 U.S. at 501, 94 S.Ct. at 2704–05 (quoting *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955)). Notwithstanding the difficulty, the obligation of review requires the assessment.

Fair monitoring of the principle also requires that the appellate court identify the conduct upon which it reaches its conclusion that particular conduct does or does not constitute disqualifying embroilment. Only so may standards emerge. This too poses a danger of disservice as particular words or conduct may be inadvertently lifted from true context. But again, the obligation of fair review requires this, particularly if disqualification is found.[3] My review of the record leads me to conclude that the district judge should have disqualified himself here.

When the judge arrived in court, he found a second court reporter present at the behest of Chaplain. The judge immediately ordered the reporter to the back of the courtroom and stated in response to Chaplain's proffered explanation of his presence, "Well, if you're inferring that my reporter or this Court is going to misquote you—." Later, when Chaplain attempted to explain his failure to have certain records with him by adverting to his lack of knowledge about the court's regulations, the judge commented, "Just because you're ignorant, Mr. Chaplain . . . ." When Chaplain insisted that he could produce evidence that the government had stolen the records in question, the judge suggested a continuance until the same afternoon so that he might obtain the evidence. Both Chaplain and his

---

**3.** It might be thought more appropriate to omit from a dissenting opinion any specific identification of conduct considered by the dissenter to constitute disqualifying embroilment. Since this dissenting view does not emerge as the court's standard for precedential purposes, the danger of disservice to the trial judge by specific reference could be thought the dominant institutional consideration. But the danger of disservice by a nonspecific conclusion of disqualification seems to me a much greater one, and one that imposes an obligation on a dissenting judge to lay his perceptions on the line. Where, as here, the district judge's conduct is by no means egregious and involves no more than completely understandable exasperation and irritation, the greater disservice would be to leave open any implication from a conclusory suggestion of disqualification that it was of a different character. There seems to me also an obligation owed by a dissenter to the majority of the court to avoid any implication that it is approving conduct that could only be vaguely hinted at in a dissenting conclusion of disqualification. I therefore identify the conduct here for these reasons only, and with the greatest respect for a fine trial judge sorely pressed in circumstances quite different from those in which this opinion is written.

daughter then vehemently insisted that this was unfair. Upon this, the obviously harried judge exclaimed, "[Y]ou keep getting up here and saying that people are going to testify that the government has stolen your records, and I'm going to make you prove it." When Mrs. Goldsticker took over the questioning seconds later, the judge anticipated her performance with the statement "I don't want to be as rude to you as I was to Mr. Chaplain." While the record may well demonstrate sufficient provocation for rudeness in ordinary human affairs, the statement seems at least a tacit concession by the judge himself that his personal involvement with Chaplain had reached an unacceptable state in the judicial forum where unequal status imposes unequal burdens of restraint. Shortly thereafter, the court warned Chaplain of the proximity of a contempt citation. "But if you make one more remark and if you talk when I'm talking, you're going back to the lockup and you're going to sit there until I cool off. Now you just—and I cool mighty slow. So just settle down."

As indicated in the majority opinion, it was following this warning that the judge sometime later, directly responding to two comments of a relatively innocuous nature when viewed in isolation, twice summarily convicted Chaplain of criminal contempt. On this record, applying the standard earlier articulated, I would hold that the district judge had become so embroiled in controversy with Chaplain that his apparent impartiality had been compromised to the point that he was disqualified to convict summarily of direct contempt.[4]

## III

Because I agree with the majority that Chaplain's conviction is not reversible as a matter of law, I would hold that he might, though he need not, be found guilty of direct contempt by another judge on the present or an expanded record. So holding I would vacate the judgment of conviction, remit his fine and remand for possible reprosecution by any of the persons authorized to prosecute for contempt under Fed.R. Crim.P. 42(b) with the charges confined to the conduct defined in the majority opinion as that properly chargeable to him.

I am authorized to state that WINTER and BUTZNER, JJ., join in this opinion.

---

4. Counsel has not directed us to any case, nor has my research developed any, where disqualification for this reason has been found by an appellate court in respect of a summary conviction imposed immediately upon occurrence of the charged conduct. In both *Taylor* and *Mayberry*, for example, where disqualification was found, the conviction, though summary, had been delayed until the end of the proceeding. *Accord, Paul v. Pleasants*, 551 F.2d 575 (4th Cir. 1977) (not disqualified). In *Howell v. Jones*, 516 F.2d 53, 59 (5th Cir. 1975), and *In re Williams*, 500 F.2d 403, 405 (2d Cir. 1974) (per curiam), disqualification for this reason was considered in respect of immediate summary conviction but was found not required. While the remedy of disqualification is obviously much easier to apply to situations where the trial judge has not immediately acted, I see no difference in underlying principle as applied to the two situations.

Of course, the option existed here to cite decisively for contempt and defer adjudication to a later time by another judge. While the obligation to disqualify may obviously not be based upon hindsight evaluations by appellate courts of the relative effectiveness of summary conviction or citation for deferred adjudication, the record here strongly suggests to me that the latter would have been at least as effectual here. There was no noticeable change in either the tone or the progress of the proceedings following the summary convictions. The whole proceeding lasted only about two and one-half hours.