914 F.2d 1492
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Steve Randolph GELLIS, a/k/a Steve Rudolph Gellis,
Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Steve Rudolph GELLIS, Defendant-Appellant.
 Nos. 89-5025, 89-5084.
 United States Court of Appeals, Fourth Circuit.
 Argued May 10, 1990.
Decided Sept. 25, 1990.
 
 Appeals from the United States District Court for the Eastern District of North Carolina, at Raleigh. James C. Fox, District Judge. (CR-88-56).
 Joseph Thomas Knott, III, Raleigh, N.C., argued, for appellant.
 John Stuart Bruce, First Assistant United States Attorney, Raleigh, N.C., argued, for appellee; Margaret Person Currin, United States Attorney, Raleigh, N.C., on brief.
 E.D.N.C.
 AFFIRMED IN PART AND REVERSED IN PART.
 Before SPROUSE, CHAPMAN, and WILKINS, Circuit Judges.
 PER CURIAM:
 
 
 1
 Steve Randolph Gellis, a/k/a Steve Rudolph Gellis, appeals his conviction by a jury of assault with a dangerous weapon with intent to do bodily harm, 18 U.S.C.A. Sec. 113(c) (West 1969), contending that the district court erred in finding he had voluntarily waived his right to counsel. He also appeals his convictions by the district court of criminal contempt, 18 U.S.C.A. Sec. 401 (West 1966), contending that the evidence was insufficient to convict him and that the consecutive sentences imposed were excessive. We affirm in part and reverse in part.
 
 I.
 
 2
 After indictment by the grand jury for assault and conspiracy,* Gellis initially appeared before a magistrate and requested that counsel be appointed to represent him. The magistrate appointed Assistant Federal Public Defender Edwin C. Walker as Gellis' counsel. Gellis subsequently pled not guilty.
 
 
 3
 During a pretrial hearing, Gellis moved to dismiss his counsel. The district court denied the motion and advised Gellis, "[Y]ou can represent yourself, if you want to.... [I]f you do that, then I will appoint Mr. Walker as standby counsel to assist you in the event that you want to ask him questions or whatever use you want to make of him." The court informed Gellis of his right to represent himself and advised him of the hazards and responsibilities of exercising that right. After reiterating the potential problems with self-representation, the court asked Gellis if he still chose to represent himself and relinquish his right to representation by counsel. Gellis replied, "I am put into the position that I must go pro se and yes, I would want a standby attorney." After further dialogue, Gellis repeatedly stated that the court had placed him in the position of being required to represent himself and that he was being forced to have Walker as standby counsel. The court found that Gellis had knowingly and voluntarily waived his right to counsel. Gellis later refused to sign a waiver of counsel form.
 
 
 4
 The following day Gellis filed a "Motion to Dismiss Standby Counsel for Ineffectiveness." He asserted that the differences in trial strategy that existed between Walker and him before Walker was dismissed as counsel prohibited Walker from serving as standby counsel. The court asked Gellis if he required Walker's assistance in securing the presence of witnesses. Gellis replied:
 
 
 5
 I do not want Mr. Walker to assist me in anything. As a pro se litigant I want to go pro se ... As a defendant of the courts, I entirely and strictly desire to go pro se without any attorney on board, behind me or whatsoever.
 
 
 6
 The court denied Gellis' request for another court-appointed attorney, rejecting Gellis' claim that the court was not allowing him to proceed pro se because it was forcing him to accept standby counsel.
 
 
 7
 Prior to jury selection, Gellis indicated that he believed he was being forced to choose between proceeding to trial without counsel or proceeding with counsel with whom he had a conflict. The court warned him that further comment of that nature could result in his being held in contempt.
 
 
 8
 Following jury selection, the trial was continued until January 9, 1989. On that day, Gellis filed a motion for appointment of counsel. In response to questions by the court, Gellis stated that he wanted to be represented by other counsel, but if the court would not appoint another attorney to represent him, he would rather be represented by Walker, for he did not believe that he "could present [his] case as well as [Walker] could." The court ordered Walker to resume full representation of Gellis. Walker, however, moved to withdraw as counsel on the grounds that Gellis had previously made claims of ineffectiveness and that he was ethically bound to bring potential conflicts to the court's attention. The court denied Walker's motion to withdraw, stating that it perceived Gellis' conduct to be in good faith. At a bench conference, Walker explained that he and Gellis disagreed on how to present the case and that he had not interviewed many of the witnesses. The following exchange then occurred between the court and Gellis:
 
 
 9
 THE COURT: Mr. Gellis, Mr. Walker tells me that inasmuch as you declined his representation last week that he has not spent time on the matter that he feels is appropriate and in view of that fact, I am going to require that you go with your original election to appear on behalf of yourself as pro se.
 
 
 10
 MR. GELLIS: I'm not able to go pro se, your honor. I cannot defend myself.
 
 
 11
 THE COURT: Well, that's the election that you've made last week and on the morning of trial the court will not appoint new counsel.
 
 
 12
 The court then reappointed Walker standby counsel.
 
 
 13
 Gellis reserved his opening statement and consequently the government presented its first witness. When given the opportunity to cross-examine the witness, Gellis requested and was granted permission to approach the bench. He claimed he was unable to question the witness and the district court advised him to ask the witness questions "like you would ask anybody else." Gellis again claimed that he was unable to represent himself and complained about the court's ruling regarding his election to proceed pro se. The following exchange then occurred in the presence of the jury:
 
 
 14
 THE COURT: .... Mr. Gellis, do you have any questions of this witness?
 
 
 15
 MR. GELLIS: I don't know how to answer nor ask the questions that--
 
 
 16
 THE COURT: (interposing) Do you have any questions of the witness, Mr. Gellis?
 
 
 17
 MR. GELLIS: If I knew how to ask them, I would ask them.
 
 
 18
 The court then excused the jury and stated:
 
 
 19
 THE COURT: Mr. Gellis, I advise you now that your answers to my questions must be responsive. They are not to be in the form of your opinions, but in response to my questions. You may answer them yes, or no, when I ask you if you have questions of the witness. If you make further comments than that I will consider it an attempt to influence the jury and I will hold you in contempt of court, do you understand that?
 
 
 20
 MR. GELLIS: I don't understand that, your honor.
 
 
 21
 THE COURT: I advise you now that your answers must be in response to my question. When I ask you if you have questions for the witness you may state either yes, or no. You are not to comment on your abilities to ask the questions or your training or any of that. Your answer to my questions has to be yes, or no. Do you understand that?
 
 
 22
 MR. GELLIS: Why, your honor, I don't know.
 
 
 23
 THE COURT: Well, you better learn.
 
 
 24
 On the second day of trial, the court informed Gellis that he could now present his opening statement. Gellis began his opening statement, "I am a defendant in this case. I am also a pro se, acting as my own counsel. As a pro se, a pro se misses a lot of things that--I do not claim to be a professional attorney, whatsoever. I was put in this position by the courts." The government objected and the court admonished Gellis to simply explain to the jury what he expected his evidence to show. Gellis replied, "I don't want to be prejudiced in my case because ... I was forced to be my own attorney." The court then excused the jury and the following exchange ensued:
 
 
 25
 THE COURT: Mr. Gellis, I indicated to you what you are to tell the jury. That is, what your evidence is expected to prove. If you refer to the fact that you are represented pro se--appearing pro se and acting as your own lawyer that is fine. But you are not to discuss your relationship with the court, what rulings the court has heretofore made. If you do it again, I will find you in contempt of court. Do you understand?
 
 
 26
 MR. GELLIS: .... I don't quite understand all of this that is going on ... and I do not know what constitutes the violation of one thing or another.
 
 
 27
 (Emphasis added.) The court again advised Gellis that in his opening statement he should tell the jury what his evidence would prove but Gellis claimed not to understand "the rules."
 
 
 28
 After the jury returned, Gellis repeated that he did not understand the court's "instructions" or "restrictions" and that he was unsure what to tell the jury. The court again advised Gellis to tell the jury what he expected the evidence to prove. Gellis replied, "Yes, your honor. I don't see--I can't defend myself, I don't know how to prove anything." The court again excused the jury, held Gellis in summary criminal contempt, and sentenced him to 179 days to run consecutively to any previous sentence.
 
 
 29
 The court then explained to Gellis the purpose of an opening statement and instructed him "not to discuss the court's ruling with regard to [his] pro se status or [his] status of representation." After Gellis claimed not to understand, the court responded, "[Y]ou are just going to have to do the best you can because I don't know how to tell you anymore."
 
 
 30
 At a bench conference, the court asked Gellis if he wanted to continue his opening statement. Gellis replied he did not know, and the court stated that he "better make up [his] mind." Gellis retorted, "You've made up my mind so far, so you might as well make it up for me, now." For the second time, the court held Gellis in summary criminal contempt and sentenced him to 179 days consecutive to all other sentences. Following imposition of sentence, the following dialogue occurred:
 
 
 31
 MR. GELLIS: .... [W]hat is this contempt thing?
 
 
 32
 THE COURT: .... [D]o you want to make an opening statement to the jury?
 
 
 33
 MR. GELLIS: I don't know. If I do, I don't know how to do it without being found in contempt.
 
 
 34
 THE COURT: One more remark and you are going to have another sentence for contempt.
 
 
 35
 After more confusion, including the severance of the co-defendant and Gellis' own testimony, the court granted Gellis' request to make a new opening statement. Gellis noted, "I have tried three times already and you have contempted me twice." The court summoned Gellis to the bench and again held him in summary criminal contempt and sentenced him to 179 days consecutive to all other sentences.
 
 
 36
 Gellis resumed his opening statement, "I have a case here that pretty well clearly shows that I am innocent. But before I even get started, I have got me a year in contempts already that I don't understand why." The court admonished Gellis to simply tell the jury what he intended to prove, and Gellis replied, "Sir, I hope to prove that I am not in contempt." The court excused the jury and again held Gellis in summary criminal contempt and sentenced him to 179 days consecutive to all other sentences, and warned him "not to comment upon the rulings of the court or anything other than the facts that you think your witnesses are going to prove." Gellis inquired whether he should refer to the fact that he had been held in contempt, and the court replied that he should not.
 
 
 37
 Gellis continued his opening statement and completed it without incident. Before calling his first witness, he requested that Walker be allowed to examine the witnesses for him. The district court ruled that Walker could not because Gellis was acting as his own attorney, but Gellis could consult Walker before asking any questions. Gellis replied, "Yes, your honor but that is not a self-choice type of deal." The district court excused the jury, again held Gellis in contempt, and sentenced him to an additional 179 days to be served consecutively. Gellis expressed confusion about what he could and could not say. The court advised, "[Y]ou are not to comment ... on the court's ruling about your attorney or your attorney status. You call your witnesses and question them."
 
 
 38
 The jury returned and Gellis began examining his first witness by stating, "I am representing myself from which the court has directed me I cannot explain why I am representing myself or I will be held in contempt." As the court excused the jury, Gellis exclaimed, "Your honor, I can't get anything out without getting held in contempt. There is no sense in even going on with this trial." The court then for the sixth time held Gellis in summary criminal contempt and sentenced him to an additional 179 days to be served consecutively to all other sentences.
 
 
 39
 The trial proceeded without further incident and the jury convicted Gellis of assault. Gellis then moved to suspend the contempt charges. The court took the motion under advisement and later affirmed by written order that the six sentences for contempt were to be served consecutively, finding that Gellis had intended to disrupt the proceedings and the contempt citations were necessary to maintain control. The district court imposed the statutory maximum sentence of 60 months imprisonment for the assault conviction, to be served consecutively to all other sentences.
 
 II.
 
 40
 Gellis contends that he did not voluntarily and knowingly waive his right to counsel. He points to the fact that he refused to sign the waiver form and to his complaints that the court was "forcing" him to proceed pro se. He claims that while he did request the court to dismiss his appointed counsel, he only intended to waive his right to particular counsel (Walker), not his right to counsel per se. He further contends that he never voluntarily intended to represent himself and that he did not know what "standby" counsel meant.
 
 
 41
 In order for a defendant to represent himself, he must voluntarily, knowingly, and intelligently relinquish his right to counsel. See Faretta v. California, 422 U.S. 806 (1975). The district court should "entertain every reasonable presumption against the waiver." United States v. Johnson, 659 F.2d 415, 416 (4th Cir.1981).
 
 
 42
 Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open."
 
 
 43
 Faretta, 422 U.S. at 835 (quoting Adams v. United States, 317 U.S. 269, 279 (1942)). We have indicated that the district court should explain the charges and possible punishments and inquire into the background, age, and general capabilities of a defendant " 'so that the ability of an accused to grasp, understand and decide is fully known.' " United States v. Gallop, 838 F.2d 105, 110 (4th Cir.) (quoting Townes v. United States, 371 F.2d 930, 934 (4th Cir.1966), cert. denied, 387 U.S. 947 (1967)), cert. denied, 487 U.S. 1211 (1988). The record amply demonstrates that the district court engaged in "a searching or formal inquiry" that fully comported with the "rigorous restrictions on the information that must be conveyed to a defendant, and the procedures that must be observed, before permitting him to waive his right to counsel at trial." Patterson v. Illinois, 487 U.S. 285, 298 (1988). Cognizant of such information, Gellis repeatedly stated that he wished to proceed pro se, once insisting that he "entirely and strictly desire[d] to go pro se without any attorney on board, behind me or whatsoever." (Emphasis added.) We hold that Gellis' decision to waive his right to counsel was voluntarily, knowingly and intelligently made.
 
 
 44
 Gellis also contends that his right to counsel was violated when the court allowed Walker to withdraw as counsel almost immediately after the court had reappointed him as Gellis' counsel. This issue essentially concerns whether the court erred in refusing to appoint substitute counsel after allowing appointed counsel to withdraw, an issue we addressed in United States v. West, 877 F.2d 281 (4th Cir.), cert. denied, 110 S.Ct. 195, 110 S.Ct. 377 (1989), 110 S.Ct. 1113 (1990). In West, the defendant dismissed his retained counsel one month before trial and proceeded pro se. Eleven days before trial, he indicated that he no longer wished to proceed pro se and requested that his earlier retained counsel be appointed to represent him. The district court denied the request for substitution of counsel and this court affirmed, stating:
 
 
 45
 [W]hether ... a motion for substitution of counsel should be granted is within the trial court's discretion, and the court is entitled to take into account the countervailing public interest in proceeding on schedule.... We have said that "[t]he defendant cannot be allowed to continue the practice, with little or no apparent reason, of hiring or firing attorneys," and this remains true when the defendant is "hiring and firing" himself. As the Seventh Circuit has observed:
 
 
 46
 A criminal defendant has an absolute right to defend himself; and with rights come responsibilities. If at the last minute he gets cold feet and wants a lawyer to defend him he runs the risk that the judge will hold him to his original decision in order to avoid the disruption of the court's schedule that a continuance granted on the very day that trial is scheduled to begin is bound to cause.
 
 
 47
 Id. at 286 (citations omitted). Once the district court determined that Walker should be allowed to withdraw, it did not abuse its discretion in refusing to appoint substitute counsel. As in West, "the district court engaged in the proper though not necessarily exclusive procedure of requiring the capricious defendant to proceed pro se while appointing standby counsel to serve as a back-up." Id.
 
 
 48
 Gellis further contends that the district court violated his right to counsel when it refused his request to allow standby counsel to examine a witness and otherwise participate as his trial counsel. As the Supreme Court has observed, "Faretta does not require a trial judge to permit 'hybrid' representation...." McKaskle v. Wiggins, 465 U.S. 168, 183 (1984). Thus, the granting of standby counsel to Gellis was a discretionary benefit conferred by the district court, not the fulfilling of a constitutional right. See United States v. Tarantino, 846 F.2d 1384, 1420 (D.C.Cir.) (Defendant "seemed to desire some sort of hybrid form of representation, whereby both he and his appointed counsel would be permitted to examine witnesses, make objections, and argue motions. While the district court would have been within its discretion in permitting this practice, [defendant] did not have a constitutional right under the Sixth Amendment to combine self-representation with representation by counsel."), cert. denied, 488 U.S. 840, 488 U.S. 867 (1988); United States v. Oakey, 853 F.2d 551, 553 (7th Cir.1988), cert. denied, 109 S.Ct. 846 (1989); United States v. Romano, 849 F.2d 812, 816 (3d Cir.1988) (dicta); see also United States v. Tutino, 883 F.2d 1125, 1141 (2d Cir.1989) ("The decision to grant or deny 'hybrid representation' lies solely within the discretion of the trial court."), cert. denied, 110 S.Ct. 1139 (1990); United States v. Mosely, 810 F.2d 93, 97-98 (6th Cir.) ("[T]he question whether to allow a defendant to par in his own defense along with counsel in 'hybrid representation' is a matter committed to the sound discretion of the trial court."), cert. denied, 484 U.S. 841 (1987); United States v. LaChance, 817 F.2d 1491, 1498 (11th Cir.) ("It is the law of this circuit that the right to counsel and the right to proceed pro se exist in the alternative and the decision to permit a defendant to proceed in a hybrid fashion rests in the sound discretion of the trial court."), cert. denied, 484 U.S. 928 (1987); United States v. Norris, 780 F.2d 1207, 1211 (5th Cir.1986) ("[A] defendant does not have the right to a hybrid representation, in which he conducts a portion of the trial and counsel conducts the balance."); United States v. Halbert, 640 F.2d 1000, 1009 (9th Cir.1981) ("A criminal defendant does not have an absolute right to both self-representation and the assistance of counsel.") (emphasis in original). These authorities establish that a defendant does not have a constitutional right to elect to proceed pro se and then call for the special appearance of standby counsel to serve as his advocate during selected portions of a trial. Just as the appointment of standby counsel is solely within the discretion of the district court, the subsequent extent of standby counsel's participation is also a matter of discretion. Under the circumstances here, we cannot say the district court abused its discretion.
 
 III.
 
 49
 Gellis next asserts that the evidence was insufficient to support his six convictions of summary criminal contempt. Pursuant to 18 U.S.C.A. Sec. 401(1):
 
 
 50
 A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as--
 
 
 51
 (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice.
 
 
 52
 See Fed.R.Crim.P. 42(a) (authorizing summary punishment of criminal contempt "if the judge certifies that the judge saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court.").
 
 
 53
 In United States v. Warlick, 742 F.2d 113 (4th Cir.1984), we stated that:
 
 
 54
 In order for the conduct to be punishable under 18 U.S.C. Sec. 401(1) four essential elements must be established beyond a reasonable doubt:
 
 
 55
 (1) Misbehavior of a person,
 
 
 56
 (2) which is in or near to the presence of the Court,
 
 
 57
 (3) which obstructs the administration of justice, and
 
 
 58
 (4) which is committed with the required degree of criminal intent.
 
 
 59
 Id. at 115. "The element of criminal intent is necessary to a contempt conviction and ... [we have] defined this intent as 'a volitional act done by one who knows or should reasonably be aware that his conduct is wrongful.' " Id. at 117 (quoting United States v. Seale, 461 F.2d 345, 369 (7th Cir.1972)). Our review of Gellis' claim that there was insufficient evidence to support his convictions of contempt is limited to "whether there is substantial evidence, taking the view most favorable to the government, from which a rational fact finder could find beyond a reasonable doubt" that Gellis' conduct satisfied the essential elements of criminal contempt. Johnson, 659 F.2d at 419 (reviewing conviction of contempt under section 401(3)).
 
 
 60
 In viewing Gellis' conduct we recognize that our perspective is confined to a cold record devoid of gesture, voice inflection, or other circumstantial indicia of behavior. We also appreciate the increasing burden Gellis' conduct was imposing on the patience and tolerance of the district court. Nevertheless, we find that several instances of Gellis' conduct did not, beyond a reasonable doubt, contain the requisite degree of criminal intent and therefore cannot constitute criminal contempt.
 
 
 61
 Before his first contempt conviction, the district court warned Gellis that he would be held in contempt if he discussed his "relationship with the court, what rulings the court has heretofore made." Gellis claimed confusion concerning the parameters of this broad restriction. When the court advised him concerning his opening statement, Gellis' reply, "I can't defend myself, I don't know how to prove anything," prompted the court to hold him in summary criminal contempt. Given the vagueness of the instructions of the court, Gellis' express confusion, and the tenuous relationship between the instructions and his statement, we cannot say that Gellis "should reasonably [have been] aware that his conduct was wrongful." Similarly, the third and fourth instances of contempt reflect Gellis' apparent belief that he was now defending himself against the contempt charges as well as the assault charges. Because Gellis reasonably could have believed that these statements were proper because they did not discuss the rulings of the court concerning his pro se status, we find that they do not contain the requisite criminal intent beyond a reasonable doubt. While we also have serious reservations about whether these statements obstructed the administration of justice, we need not engage in an analysis of this element.
 
 
 62
 However, the second instance of contempt--Gellis' complaint that the court had "made up [his] mind so far"--contains the essential elements necessary to sustain a conviction of criminal contempt. Likewise, in the fifth and sixth instances Gellis should reasonably have been aware that his comments concerning the ruling of the court on his pro se status were improper. By this point the sheer number of prior warnings and, indeed, convictions adequately warned Gellis that such conduct was wrongful. Cf. In Re Chaplain, 621 F.2d 1272, 1276 (4th Cir.) (en banc) ("[W]here the record reveals a pattern of potentially disruptive conduct preceding a summary conviction, the specification of a single episode adequately charges as well the entire course of like antecedent conduct from the time when it was fairly identified to the contemnor as potentially contumacious."), cert. denied, 449 U.S. 834 (1980).
 
 IV.
 
 63
 In conclusion, we affirm Gellis' conviction of assault and his second, fifth and sixth convictions of criminal contempt. We reverse, however, Gellis' first, third and fourth convictions of criminal contempt.
 
 AFFIRMED IN PART AND REVERSED IN PART
 
 
 *
 The district court subsequently granted Gellis' motion for acquittal on the conspiracy charge